# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# GAINESVILLE DIVISION

| | | |
|---|---|---|
| DONNA MARIE CHEEKS, | : | CIVIL ACTION NO. |
|    Plaintiff, | : | 2:17-CV-00033-RWS-JCF |
| | : | |
| v. | : | |
| | : | |
| DR. MONICA R. HILL, | : | PRISONER CIVIL ACTION |
|    Defendant. | : | 42 U.S.C. § 1983 |

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION

Plaintiff, formerly confined at Lee Arrendale State Prison ("LASP") in Alto, Georgia, seeks relief in this action based on her allegations that Defendant's medical deliberate indifference resulted in the surgical removal of her infected right foot in November 2015. (*See* Doc. 8 at 3-4). Defendant has filed a motion for summary judgment. (Doc. 28). Plaintiff has not responded.

## I.  Summary Judgment Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "[Former] Rule 56(c) [now Rule 56(a)] mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When

1

considering a summary judgment motion, a court must "view the evidence and all factual inferences therefrom in the light most favorable" to the non-movant. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999). "A court need not permit a case to go to a jury, however, when the inferences that are drawn from the evidence, and upon which the non-movant relies, are implausible." *Cuesta v. Sch. Bd. of Miami-Dade Cnty.*, 285 F.3d 962, 970 (11th Cir. 2002) (internal quotations omitted). And "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations omitted).

The movant bears the initial burden of demonstrating that summary judgment is warranted. *Apcoa, Inc. v. Fidelity Nat'l Bank*, 906 F.2d 610, 611 (11th Cir. 1990). The movant may do so by showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Once the movant has properly supported the summary judgment motion, the non-movant then must "come forward with specific facts showing that there is a *genuine issue for trial*," i.e., that the evidence is sufficient to support a jury verdict in the non-movant's favor. *Bailey v. Allgas, Inc.*, 284

F.3d 1237, 1243 (11th Cir. 2002) (internal quotations omitted); *see also Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991) (stating that "non-moving party must come forward with *significant, probative evidence*" (emphasis added)). "[C]onclusory assertions . . . [without] supporting evidence are insufficient to withstand summary judgment." *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997).

II.     **The Undisputed Material Facts**

Defendant, who "arrived at LASP in early August of 2015" (Doc. 28-9 (Hill Decl.) ¶ 3), sets forth as undisputed the following material facts:

1. From December 16, 2013, until April 17, 2017, Plaintiff Donna Marie Cheeks was incarcerated at [LASP].

2. Defendant Dr. Monica Hill ("Dr. Hill") is the current Medical Director at LASP.

3. Upon [Plaintiff's] arrival at LASP, prison medical staff completed a diagnostic physical examination . . . .

4. The physical exam revealed that Cheeks [Plaintiff] suffers from myriad health issues including chronic obstructive pulmonary disease, congestive heart failure, Hepatitis C, and diabetes mellitus.

5. Cheeks also suffers from neuropathy resulting in loss of sensation in her lower extremities.

6. For this reason, Cheeks was provided with a pair of orthopedic soft shoes.

7. In January 2014, the orthopedic shoes Cheeks received caused a blister to

3

develop under the big toe of her right foot.

8. Cheeks put in a sick call request and was examined by nurses who diagnosed her with a bunion and prescribed daily bandage changes.

9. On February 7, 2014, medical staff first noted the presence of a "callous" or "ulcerative lesion" on Cheeks' right foot and prescribed various antibiotics.

10. On August 26, 2014, medical staff indicated a possible infection of Cheeks' right foot.

11. A subsequent culture of the wound revealed the presence of Group B Streptococcus.

12. Medical staff prescribed daily treatments with an antiseptic (Betadine) and a topical antibiotic (Silvadene).

13. By September 8, 2014, medical staff had noted that the infection in Cheeks' right foot was improving.

14. From December 2014 through January 2015, medical staff recorded that Cheeks' feet appeared to be improving and that the wound on Cheeks' right foot was healing.

15. Five months after Cheeks' foot wound had initially become infected, on January 30, 2015, medical staff noted that there were "[n]o sores on [Cheeks'] feet at present."

16. From June through August 2015, there was no notation in Cheeks' medical records of any blister, ulcer, sore, or other wound on any of Cheeks' lower extremities.

17. Dr. Hill first arrived at LASP in early August 2015.

18. Cheeks was examined by Dr. Hill on August 12, 2015.

19. On August 20, 2015, Dr. Hill first noted the presence of a "diabetic foot

blister" on Cheeks' right foot.

20. Dr. Hill ordered daily dressing changes and prescribed three different medications and instructed nurses to apply the medications to Cheeks' right foot.

21. Dr. Hill chose this course of treatment based on a review of Cheeks' medical records and because similar treatments had been used to treat Cheeks' foot wound in August and September of 2014.

22. Dr. Hill also referred Cheeks for a consultation with Hanger Clinics in Gainesville, Georgia to receive a new pair of orthopedic walking shoes.

23. Dr. Hill also placed Cheeks on a special diet in order to better manage her blood-sugar levels.

24. Cheeks testified that by the middle of August 2015, her foot had begun to smell and that nurses once again examined her foot and diagnosed her as having bunions or blisters. Cheeks Dep. [Doc. 28-3 at] 24-25.

25. No odor or purulence [pus discharge] was recorded in any of Cheeks' medical records at that time.

26. Cheeks continued to receive antibiotics and daily dressing changes.

27. On September 6, 2015, medical staff noted a "diabetic wound" or "old blister" on Cheeks' right foot.

28. Staff also noted "some yellowish drainage" from the "popped" blister.

29. Dr. Hill prescribed a daily antibiotic (Bactrim) as well as daily wet-to-dry dressing changes for five days.

30. Bactrim is intended to treat and prevent a host of possible infections such as MRSA [Methicillin-resistant Staphylococcus aureus].

31. On September 8, 2015, Cheeks was seen at the Hanger Clinic in Gainesville,

      Georgia and fitted for a new pair of orthopedic shoes.

32. On September 9, 2015, Dr. Hill recorded that the wound on Cheeks' foot had "been manipulated," noting "two longitudinal cuts consistent with razor blade use."

33. Manipulating an open wound can set back the healing process and increases the possibility of an infection.

34. Dr. Hill also recorded that there was "no purulence noted" around the foot.

35. On September 10, 2015, Dr. Hill recorded that the ulcer was "high risk" but appeared to be "healing."

36. Dr. Hill also noted that Cheeks reported that her foot was feeling better.

37. This indicated to Dr. Hill that the prescribed modes of treatment were working.

38. On September 28, 2015, Dr. Hill again ordered that Cheeks receive daily dressing changes for seven days.

39. On October 9, 2015, Dr. Hill noted that there was "no purulence" or discoloration of Cheeks' right foot.

40. By mid-October 2015, Cheeks testified that her foot had begun to smell again.

41. Cheeks also testified that her skin became discolored and there was discharge from the wound on her foot.

42. Wound care flow sheets for this time period did not indicate any odor, discoloration, or purulence.

43. Cheeks was again examined by Dr. Hill on November 2, 2015.

44. On November 3, 2015, Dr. Hill used surgical scissors to remove several

pieces of dried skin from around the wound.

45. On November 4, 2015, Dr. Hill again prescribed an antibiotic (Bactrim) as well as daily wet-to-dry dressing changes.

46. Dr. Hill also scheduled Cheeks for a follow-up appointment in two weeks' time.

47. On November 6, 2015, Dr. Hill once again used surgical scissors to remove several pieces of dried skin from around the wound.

48. On November 10, 2015, Dr. Hill ordered Dakin's solution wet-to-dry dressing changes for twenty-one days and prescribed an additional antibiotic, Clindamycin.

49. Clindamycin is intended to treat and prevent the streptococcus bacteria that can cause infection and also increases coverage of a host of other possible infections such as Staph and MRSA.

50. Dr. Hill further ordered an x-ray of Cheeks' right foot.

51. Cheeks testified that on November 12, 2015, she became feverish.

52. Cheeks describes the onset of the fever as having happened "within a matter of hours."

53. On November 13, 2015, Cheeks was admitted to the prison infirmary with a temperature of 101 degrees.

54. Lab results confirmed the presence of several strands of bacteria in Cheeks' right foot.

55. Dr. Hill ordered that Cheeks be placed on bedrest and prescribed an additional antibiotic, Ciprofloxacin.

56. Ciprofloxacin is intended to treat and prevent the pseudomonas bacteria that can cause infection.

57. Placing Cheeks on bedrest was intended to roll back the infection in Cheeks' foot.

58. Cheeks was continuously monitored and received regular dressing changes while in the infirmary.

59. An x-ray was also taken of Cheeks' right foot.

60. The same day, Cheeks signed a Refusal of Treatment Against Medical Advi[c]e form.

61. Cheeks was advised of the possible complications, "up to and/or including death," that could occur due to her refusal to be treated.

62. On November 15, 2015, nurses noted a "[s]trong odor" emanating from Cheeks' right foot.

63. Nurses also noted discoloration of the foot, drainage, and "necrotic tissue" surrounding the wound as well as a "large raised area" that had "appeared overnight."

64. Because November 15, 2015, was a Sunday, Dr. Hill was not present at LASP and was not notified of these developments until the following day.

65. When Dr. Hill reported to LASP on November 16, 2015, she immediately consulted with a local emergency room physician and ordered a van to transport Cheeks to Habersham County Medical Center in Demorest, Georgia.

66. Cheeks was treated by the emergency department at Habersham County Medical Center from November 16 until November 23, 2015.

67. On November 23, 2015, Cheeks was transferred to WellStar Atlanta Medical Center in Atlanta, Georgia.

68. On November 27, 2015, surgeons at Atlanta Medical Center performed a

below-the-knee amputation of Cheeks' right foot.

69. Progress Reports and Encounter Forms maintained as part of Cheeks' medical records indicate that Cheeks was treated by Dr. Hill on at least seven separate occasions after Dr. Hill's arrival in August 2015.

70. From the time Dr. Hill first noted the "wound" or "blister" on Cheeks' right foot on September 6, 2015, until Cheeks was sent out on November 16, 2015, medical staff at LASP kept consistent Wound Care Flow Sheets tracking the size and appearance of the wound.

71. Uninfected foot wounds in diabetic patients can typically take a prolonged time to heal.

72. Medical staff at LASP have provided sworn testimony that Cheeks' foot wound was generally improving until an acute infection set in on November 13, 2015. Kiefer Decl. [Doc. 28-7] ¶ 5; Emery Decl. [Doc. 28-8] ¶ 5; Hill Decl. ¶ 23.

73. This indicated to Dr. Hill that the prescribed modes of treatment were working until the onset of the infection.

74. Medical staff at LASP routinely noted that Cheeks was a "non-compliant" diabetic patient, often failing to take her medications and failing to abide by the prescribed dietary restrictions.

75. In addition, medical records indicate that on multiple occasions Cheeks missed or refused the administration of her medications. *See* [Medical Records, Doc. 28-4] at 17, 18, 29, 39.

76. Medical staff at LASP do not have the authority to force inmates to take their prescribed medications and have limited ability to ensure that inmates are complying with their prescribed treatments or dietary restrictions.

77. Medical staff at LASP have provided sworn testimony that Cheeks' failure to take her prescribed medications and comply with her prescribed dietary restrictions exacerbated her diabetic condition. Kiefer Decl. ¶ 7; Emery Decl.

¶ 7; Hill Decl. ¶ 26.

78. No doctor has ever informed Cheeks that a lack of treatment by Dr. Hill caused her foot to be amputated. Cheeks Dep. [at] 38-39.

79. It is undisputed that Dr. Hill never refused to treat Cheeks.

(Doc. 28-1 (citations to Hill Decl. (Doc. 28-9), Emery Decl. (Doc. 28-8), Kiefer Decl. (Doc. 28-7), Whitworth Decl. (Doc. 28-6), Pl.'s Wound Care Flow Sheets (Doc. 28-5), Pl.'s Medical Records (Doc. 28-4) & Pl.'s Dep. (Doc. 28-3) omitted)).

Because Plaintiff has not responded to Defendant's summary judgment motion, filed and served on May 31, 2018, the Court deems Plaintiff to have admitted the material facts set forth above. *See* Local Rule 56.1(B)(2)(a).

## III. Discussion

### A. The Law Of Medical Deliberate Indifference

To prevail on a claim for relief against a state or local official, a plaintiff must establish that an act or omission committed by a person acting under color of state law deprived him of a right, privilege, or immunity secured by the Constitution or laws of the United States. *See Richardson v. Johnson*, 598 F.3d 734, 737 (11th Cir. 2010).

The Eighth Amendment prohibits indifference to a prisoner's serious medical needs so deliberate that it "constitutes the unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotations omitted). "To prevail on a claim

of deliberate indifference, a plaintiff must show: (1) a serious medical need; (2) defendant's deliberate indifference to that need; and (3) causation between the defendant's indifference and the plaintiff's injury." *McDaniels v. Lee*, 405 Fed. Appx. 456, 458 (11th Cir. 2010) (citing *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306-07 (11th Cir. 2009)).

"A 'serious medical need' is one that is diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would recognize the need for medical treatment." *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1317 (11th Cir. 2010) (internal quotations omitted). "In the alternative, a serious medical need is determined by whether a delay in treating the need worsens the condition." *Mann*, 588 F.3d at 1307.

"To satisfy the subjective element of [a] deliberate indifference [claim, a] . . . Plaintiff must prove three things: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005) (internal quotations omitted) (noting that subjective knowledge requires that defendant " 'must *both* be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* [] must also draw the inference' " (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (emphasis added in *Bozeman*)); *see also Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1158 (11th Cir. 2010). But "[w]hether a particular defendant [to a deliberate indifference claim] has subjective knowledge of the risk of serious harm is a question of fact 'subject to

11

demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.' " *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1327 (11th Cir. 2007) (quoting *Farmer*, 511 U.S. at 842).

"A core principle of Eighth Amendment jurisprudence in the area of medical care is that prison officials with knowledge of the need for care may not, by failing to provide care, delaying care, or providing grossly inadequate care, cause a prisoner to needlessly suffer the pain resulting from his or her illness." *McElligott v. Foley*, 182 F.3d 1248, 1257 (11th Cir. 1999) (noting that "prison officials may violate the Eighth Amendment's commands by failing to treat an inmate's pain"). In determining whether a delay in treatment rises to the level of deliberate indifference, relevant factors include: "(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay." *Goebert*, 510 F.3d at 1327.

> Delay in providing "diagnostic care and medical treatment known to be necessary" can qualify as deliberate indifference. *H.C. ex rel. Hewett v. Jarrard*, 786 F.2d 1080, 1086 (11th Cir. 1986); *see also Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985) ("[I]f necessary medical treatment has been delayed for non-medical reasons, a case of deliberate indifference has been made out."). That delay, however, must be "tantamount to unnecessary and wanton infliction of pain," and [the Eleventh Circuit] *require[s] an inmate who alleges a delay-based Eighth Amendment claim to "place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187-88 (11th Cir. 1994) (quotation

marks omitted), *abrogated on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002).

*Simmons v. Monserrate*, 489 Fed. Appx. 404, 406-07 (11th Cir. 2012) (emphasis added) (affirming grant of summary judgment to defendants on plaintiff's deliberate indifference claim, in part because, "importantly, [plaintiff] has not proffered any 'verifying medical evidence' to establish the detrimental effect of a delay in medical treatment"). "To survive summary judgment, a plaintiff must show that the delay attributable to the defendant's [alleged] indifference likely caused the plaintiff's injury" and, as noted above, "*must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed.*" *Lee*, 405 Fed. Appx. at 458-59 (emphasis added) (citing *Goebert*, 510 F.3d at 1329; *Hill*, 40 F.3d at 1188).

And negligence, even rising to the level of medical malpractice, does not constitute deliberate indifference. *McElligott*, 182 F.3d at 1254; *see also Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999) (noting that it is well-settled that "medical malpractice—negligence by a physician—is insufficient to form the basis of a claim for deliberate indifference"), *amended by* 205 F.3d 1264 (11th Cir. 2000); *Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995) (noting that "[m]ere negligence in diagnosing or treating a medical condition is an insufficient basis" for a deliberate indifference claim). As long as the medical treatment provided is "minimally adequate," a prisoner's preference for a

13

different treatment does not give rise to a constitutional claim. *See Harris v. Thigpen*, 941 F.2d 1495, 1504-05 (11th Cir. 1991); *see also Harris v. Leder*, 519 Fed. Appx. 590, 595 (11th Cir. 2013) (" 'Federal and state governments . . . have a constitutional obligation to provide minimally adequate medical care to those whom they are punishing by incarceration.' " (quoting *Thigpen*, 941 F.2d at 1504)).

### B.     Defendant's Arguments

Defendant notes, "Uninfected foot wounds in diabetic patients typically take a prolonged time to heal, and although [she] described the ulcer as 'high risk,' it was generally seen to be improving until an acute infection set in on November 13, 2015 — only a few days before Plaintiff was sent out to Habersham County Medical Center." (Doc. 28-2 (Br. Supp. Def.'s Mot. Summ. J.) at 16; *see id.* at 16 n.4 ("[W]hen Cheeks' foot first became infected in August, 2014 (before Dr. Hill's arrival at LASP), it took approximately five months of treatment before medical staff noted that the foot wound had healed.")); *id.* at 16 n.3 ("Although Plaintiff testified that her foot intermittently began to smell in both August and October, 201[5], there is no indication of any purulence, odor, discoloration, or other signs of infection in Plaintiff's medical records during that time period.")).

Defendant argues that

Plaintiff cannot establish the subjective component of the deliberate

14

>indifference test, specifically disregard of a known risk and conduct that is more than negligence. The undisputed evidence shows that Dr. Hill and other medical staff at LASP provided Plaintiff with a continuing assessment and course of treatment for her foot. This included prescribed dietary guidelines; intermittent daily dressing changes; topical treatments; referral to an outside care provider for better orthopedic shoes; removal of dried skin from around the wound; constant monitoring for purulence, odor, or other signs of infection; antibiotics (including variations to increase the scope of coverage for possible bacterial infection); and diagnostic x-rays. Moreover, the treatments provided to Plaintiff changed over time with her presentation, indicating that Dr. Hill and the other providers were assessing, and reassessing, her condition and providing treatment accordingly.
>
>This course of treatment was chosen based on a review of Cheeks' medical records and because similar medications had been used to successfully treat Cheeks' foot wound in the past. Hill Decl. ¶ 6. Furthermore, this course of treatment demonstrates that Dr. Hill was aware of and did not disregard the risk of a possible infection of Plaintiff's foot. Because the record shows that Dr. Hill and other medical staff provided an ongoing course of treatment for Plaintiff's condition based on their professional judgment and assessment, there is no Eighth Amendment claim.

(*Id.* at 17-18 (footnote omitted)).

Defendant notes that at the end of Plaintiff's deposition, when asked what Dr. Hill should have done differently, Plaintiff responded that "she should have sent me out and got my foot debrided like it supposed to [sic]," and Dr. Hill should have sent Plaintiff "to a real diabetic surgeon doctor or whatever," because had Dr. Hill done so, Plaintiff "feel[s] like I still have my foot." (*Id.* at 18 (citing Pl.'s Dep. at 77:22-78:9)). Defendant states, "It is clear that Plaintiff's claim is not based on a lack of treatment, but rather her desire for a different course of treatment — namely, debriding by a 'real diabetic surgeon.' " (*Id.*

at 18-19). But "[s]uch claims do not fall within the ambit of the Eighth Amendment because they involve the 'exercise of professional judgment.' " (*Id.* at 19). In sum, Defendant argues that

> the record clearly shows that Plaintiff was receiving consistent medical care based on assessments made by Dr. Hill and others of her foot condition. Because Plaintiff's desire for a different course of treatment by an outside care provider does not rise to the level of an Eighth Amendment claim, Dr. Hill is entitled to summary judgment.

(*Id.*).

### C. <u>Analysis</u>

Because Plaintiff has not responded to Defendant's summary judgment motion, there is no dispute here, based on Defendant's statement of undisputed material facts, that Plaintiff received medical attention for her infected foot on a regular basis while at LASP, including various medications for infection. These undisputed facts are amply supported by Plaintiff's medical records. (*See* Docs. 28-1, 28-4, 28-5). At most, Plaintiff's claims constitute a disagreement over the course of the care she received at the LASP, and, as such, they do not rise to the level of a constitutional violation. *See McElligott*, 182 F.3d at 1254; *Thigpen*, 941 F.2d at 1504-05.

Although the end result of Plaintiff's treatment was the loss of her foot, which might *perhap*s be the basis for a medical malpractice claim, the extent of the treatment that Plaintiff received — treatment that had, in the recent past, successfully resolved a similar

foot infection — demonstrates that Dr. Hill was not deliberately indifferent to Plaintiff's medical needs.  Indeed, as soon as Dr. Hill became aware of the sudden turn for the worse that Plaintiff experienced on November 15, 2015, she sent Plaintiff to a local clinic for evaluation and treatment, including debridement (*see* Doc. 28-4 at 59) — which unfortunately could not save Plaintiff's foot.  Plaintiff has offered no medical evidence that the loss of her foot was caused by constitutionality inadequate treatment of her condition under Dr. Hill, between early August and November 16, 2015, or by a delay in her referral to a "real diabetic surgeon."  Although the Court sympathizes with Plaintiff's situation, she is not entitled to relief here under the controlling caselaw, cited above, that governs her medical deliberate indifference claim.

## IV.   Conclusion

Because there is no genuine issue of material fact for trial with respect to Plaintiff's medical deliberate indifference claim, **IT IS RECOMMENDED** that Defendant's Motion For Summary Judgment (Doc. 28) be **GRANTED** and that this action be **DISMISSED**.

The Clerk is **DIRECTED** to withdraw the reference to the Magistrate Judge.

**SO RECOMMENDED** this 10th day of September, 2018.

   /s/ *J. C<small>LAY</small> F<small>ULLER</small>*
J. CLAY FULLER
United States Magistrate Judge